AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Black Omen 015 Laptop Computer<br>Serial No. 5CDO38LXOZ seized as Exhibit N-19<br>("Target Device 1") | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **23-mj-03805-MMP** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

    The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

        ☑ evidence of a crime;

        ☑ contraband, fruits of crime, or other items illegally possessed;

        ☑ property designed for use, intended for use, or used in committing a crime;

        ☐ a person to be arrested or a person who is unlawfully restrained.

    The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

    The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

      ☑ Continued on the attached sheet.

      ☐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
          18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

                                         *Applicant's signature*

                                    **TFO Lisa Amman, DEA**
                                    *Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: \_\_\_\_October 13, 2023\_\_\_\_

                                    *Judge's signature*

City and state: \_\_San Diego, California\_\_

               Hon. Michelle M. Pettit, United States Magistrate Judge
                                    *Printed name and title*

## <u>ATTACHMENT A-1</u>

PROPERTY TO BE SEARCHED

The property to be searched:

One black Omen 015 laptop computer, serial number 5CDO38LXOZ, seized as Exhibit N-19 (**Target Device 1**).




**Target Device 1** is currently in the possession of the Drug Enforcement Administration (DEA) as evidence and being held at the DEA San Diego Field Division, located at 4560 Viewridge Avenue, San Diego, CA 92123.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search **Target Devices 1-3** (hereinafter referred to as **Target Devices**) described in Attachments A-1, A-2 and A-3, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Devices** for evidence described below. The seizure and search of **Target Devices** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from **Target Devices** will be electronic records, contact lists, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of June 21, 2022 through August 28, 2023:

a.  tending to identify attempts to possess fentanyl, heroin, methamphetamine or other federally controlled substances with the intent to distribute them within the United States;

b.  tending to identify other accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the possession of fentanyl, heroin, methamphetamine or other federally controlled substances with the intent to distribute them within the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in the possession of methamphetamine or other federally controlled substances with the intent to distribute them within the United States;

d.  tending to identify travel to or presence at locations involved in the possession of fentanyl, heroin, methamphetamine or other federally controlled substances with the intent to distribute them within the United States, including stash houses, load houses, and/or delivery points;

    e.        tending to identify the user of, or persons with control over or access to, **Target Devices**; and/or

    f.        tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 21, United States Code, Section 841(a)(1).**

ABM
10/13/2023

1    **AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS**

2         I, Lisa Amman, Task Force Officer with the Drug Enforcement Administration,

3    having been duly sworn, do hereby state as follows:

4                                   **INTRODUCTION**

5    1.    This affidavit supports an application for a warrant to search the following:

6              a. One black Omen 015 laptop computer, serial number 5CDO38LXOZ,

7                 seized as Exhibit N-19 (**Target Device 1**);

8              b. One black Apple iPhone with IMEI number 352888117240350, seized as

9                 Exhibit N-24 (**Target Device 2**); and

10             c. One red Apple iPhone with IMEI number 356479104668039, belonging to

11                C.Y., seized as Exhibit N-23 (**Target Device 3**)

12                (collectively, the "Target Devices")

13   as further described in Attachments A-1 through A-3, and to seize evidence of crimes,

14   specifically violations of Title 21, United States Code, Sections 841, as further described in

15   Attachment B. The requested warrants relate to the investigation of Ryan Joseph PAYNE,

16   who was arrested for violations of Title 21, U.S.C., Sections 841(a)(1) – Possession with

17   Intent to Distribute Heroin, Title 21, U.S.C., Sections 841(a)(1) – Possession with Intent to

18   Distribute Fentanyl, and Title 21, U.S.C., Sections 841(a)(1) – Possession with Intent to

19   Distribute Methamphetamine on August 28, 2023. **Target Device 1** was seized during a

20   consent search of PAYNE's hotel room on August 3, 2023, when PAYNE was arrested on

21   California state drug distribution charges. **Target Devices 2 and 3** were seized during

22   PAYNE's arrest on August 28, 2023. All three of the **Target Devices** are currently in the

23   custody of the Drug Enforcement Administration (DEA) San Diego Field Division (SDFD),

24   located at 4560 Viewridge Avenue, San Diego, CA 92123.

25   2.    The following is based on my own investigation, oral and written reports by

26   other law enforcement officers, debriefs, database and public records checks, searches,

27   phone analysis, and other investigations. In preparing this affidavit, I have conferred with

28   other agents and law enforcement personnel who are experienced in the area of narcotics

investigations, overdose investigations and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. Because this affidavit is made for the limited purpose of obtaining search warrants for the **Target Devices**, it does not contain all the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Times (PST) unless otherwise specified.

## **TRAINING AND EXPERIENCE**

3.      I am a peace officer employed as an investigator with the State of California Department of Health Care Services ("DHCS"), assigned to the South Section of the DHCS Investigations Branch, located in San Diego, California. I have been continuously employed as a peace officer since 2001 and I have been employed continuously as a DHCS Investigator since 2008. During this time, I have investigated cases involving the diversion and/or trafficking of controlled prescription drugs, such as oxycodone, hydrocodone, and amphetamine salts. I have also investigated cases regarding the possession, transportation and sales of illicit controlled substances including heroin, cocaine, methamphetamine, hashish, and fentanyl. I have directed and participated in hundreds of drug investigations regarding the illegal acquisition and/or distribution of controlled drugs and effected or participated in more than a hundred arrests for violations of the California Health & Safety Code and Title 21 of the United States Code.

4.      I am also a duly appointed Task Force Officer (TFO) of the DEA, currently assigned to the DEA SDFD, San Diego, California. I have been assigned continuously as a DEA TFO since 2016. As a TFO, I am authorized to swear out complaints and search warrants for violations of federal law, including violations of Title 21 of the United States Code.

5.      I am currently assigned to DEA SDFD's San Diego County Integrated Narcotic Task Force (NTF) Team 10 and have been since June 2018. NTF Team 10 is comprised of DEA Special Agents (SAs), Task Force Agents (TFAs) from Department of Homeland

Security (DHS) – Homeland Security Investigations (HSI), and TFOs from San Diego Police Department (SDPD), La Mesa Police Department (LMPD), San Diego County District Attorney's Office (SDCDA), and DHCS. NTF Team 10 primarily investigates illegal drug trafficking organizations (DTOs) operating in the United States and internationally, including those DTOs whose operations involve the distribution of wholesale quantities of fentanyl, oxycodone, hydrocodone, alprazolam, other controlled pharmaceutical drugs, cocaine, methamphetamine, marijuana, heroin, and hashish in and around the San Diego, California area. The primary focus of NTF Team 10 is the investigation of fatal drug overdoses.

6.     I am familiar with narcotic controlled substances, including heroin, methamphetamine, cocaine, hashish, marijuana, fentanyl, and prescription pharmaceutical drugs. During the course of my career, I have become familiar with information about how criminals use telephones and computers to plan and carry out crimes, communicate with co-conspirators, dispose of evidence, and escape prosecution. I am familiar with how drug dealers and drug users use telephones and computers to arrange meetings and sales of controlled substances, as well as to coordinate the planning and execution of other types of crimes including identity theft.

7.     In the course of my duties, I have been a case agent directing drug-related investigations. I have participated in many aspects of criminal investigations including reviewing evidence, conducting physical and electronic surveillance, and executing search and arrest warrants. I have interviewed defendants and witnesses while conducting various investigations. I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers.

8.     Through the course of my training, investigations, prior law enforcement experience, and conversations with other law enforcement personnel, I am aware that it is a common practice for individuals involved in the manufacturing and distribution of controlled substances to work in concert with other individuals and to do so by utilizing cellular telephones, computers, and other portable communication devices to maintain

1  communications with co-conspirators in order to further their illicit criminal activities. Drug
2  traffickers often require the use of a telephone facility to negotiate times, places, schemes,
3  and manners for importing, possessing, concealing, manufacturing, and distributing
4  controlled substances and for arranging the disposition of proceeds from the sales of
5  controlled substances. I know that professional drug operations depend upon maintaining
6  their extensive contacts. Telephones and computers enable drug traffickers to maintain
7  contact with associates, suppliers, and customers. As such, those devices can store
8  information about locations, including residences used as stash houses, homes of co-
9  conspirators, storage lockers where supplies and related illicit items (such as firearms and
10 cash proceeds) are kept, banks and ATM machines where illicit money-movement activity
11 occurs, and public parking lots where drug deals may happen. They also can store, among
12 others, messages referring to trafficking arrangements and the payment of monies related to
13 trafficking, the names and contact information of co-conspirators, and photographs evincing
14 drug-trafficking activity. I also know that drug traffickers sometimes use fraudulent
15 information, such as fictitious names and false addresses, to subscribe to communication
16 facilities, especially cellular phones. They also often use coded language to obscure
17 conversations about their unlawful activity because they believe coded language makes it
18 more difficult to identify their conduct.

19        9.      Based upon my training, experience, and consultations with law enforcement
20 officers experienced in narcotics trafficking investigations, and all the facts and opinions
21 set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s))
22 and computers can and often do contain electronic evidence, including, for example, phone
23 logs and contacts, voice and text communications, and data, such as emails, text messages,
24 chats and chat logs from various third-party applications, photographs, audio files, videos,
25 and location data. This information can be stored within disks, memory cards, deleted data,
26 remnant data, slack space, and temporary or permanent files contained on or in the cellular
27 telephone. Specifically, searches of cellular telephones and computers of individuals
28 involved in the importation of narcotics or other merchandise may yield evidence:

a.     tending to indicate efforts to distribute or possess with the intent to distribute federally controlled substances;

b.     tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the distribution or possession with the intent to distribute federally controlled substances;

c.     tending to identify co-conspirators, criminal associates, or others involved in the distribution or possession with the intent to distribute federally controlled substances;

d.     tending to identify travel to or presence at locations involved in the distribution or possession with the intent to distribute federally controlled substances, such as stash houses, load houses, or delivery points;

e.     tending to identify the user(s) of, or person(s) with control over or access to, the **Target Device(s)**; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

### *Response to Suspected Overdose on June 13, 2023*

10.     On June 13, 2023, at approximately 5:42 p.m., San Diego Police Department (SDPD) officers were dispatched to a death call in a hotel room in the Mission Valley neighborhood of San Diego, California within the Southern District of California. Officers entered the hotel room and found twenty-nine-year-old Z.A. deceased on the bed. Officers notified the Medical Examiner's Office along with San Diego County Integrated Narcotic Task Force (NTF) Team 10.

11.     NTF Team 10 arrived on scene and assisted the Medical Examiner Investigator (MEI) with a search of the hotel room. On the left nightstand, next to the bed and nearest to

1  the decedent, the MEI located a clear "Ziploc" style baggie which was torn open and
2  contained a brown sticky substance (subsequently tested by the DEA Southwest Regional
3  Laboratory (SWRL) and determined to be approximately 4.2 grams of heroin) along with a
4  syringe and a metal spoon which each contained a brown liquid (also determined by the
5  DEA SWRL to contain heroin). Also on the nightstand, agents found a black Apple
6  iPhone cellular telephone (hereinafter referred to as "Z.A.'s Apple iPhone.")

7       12.    On July 5, 2023, Team 10 TFO Lisa Amman obtained a judicially authorized
8  California state search warrant (#2307051646-OTH-JMB-SW-1) signed by San Diego
9  Superior Court Judge, the Honorable Jay Bloom, authorizing the search of Z.A.'s Apple
10  iPhone.

11                      *Review of Z.A.'s Apple iPhone*

12       13.    Investigators conducted a manual review of Z.A.'s Apple iPhone. During the
13  review, investigators found a text conversation between Z.A. and someone utilizing two
14  different telephone numbers on two separate text threads. One text thread was between Z.A.
15  and someone utilizing telephone number (XXX) XXX-5439 (hereinafter referred to as "-
16  5439") and the other was between Z.A. and someone utilizing telephone number (XXX)
17  XXX-5178 (hereinafter referred to as "-5178"). Based on the messages, investigators
18  believed that both phone numbers were being utilized by the same person. One of the
19  messages on the text chat utilizing the -5439 telephone number referred Z.A. to the -5178
20  telephone number. Investigators reviewed the two text conversations, which began on June
21  12, 2023, at approximately 11:01 p.m., and saw that the conversation started with the -5439
22  phone number, switched over to the -5178 phone number, and then concluded on June 13,
23  2023 at approximately 1:24 a.m. on the -5439 phone number. The following are excerpts
24  from the two text threads:

25                      *Text Conversations with Z.A.*

26  June 12, 2023, Chat Between Z.A. and -5439

27  Z.A.: Yo yo bro (11:01 p.m.)

28  -5439: my phone has received your message. I'll message ya back once I see it. (11:01 p.m.)

1  -5439: Thanks for calling. Can I help you with a text instead? Message (XXX) XXX-5178

2  or call – Sent from Text Free[1] (11:02 p.m.)

3

4  June 12, 2023, Chat Between Z.A. and -5178

5  Z.A.: Yo yo. It's the dude that picked you up rolling balls in my Mercedes lol (11:02 p.m.)

6  -5178: Yo (11:02 p.m.)

7  Z.A.: You remember? (11:02 p.m.)

8  -5178: Of course. Can't forget. Glad you're still alive (11:03 p.m.)

9  Z.A.: Lmaooooo. You loaded up right now, (11:03 p.m.)

10  -5178: Eases my concience [sic] (11:03 p.m.)

11  Z.A.: Yeah I feel it (11:03 p.m.)

12  Z.A.: Can I come by tonight. I'm not gonna be in SD until like 1 (11:04 a.m.)

13  Z.A.: But I need to pick up a lot like I always do lol (11:05 p.m.)

14  -5178: I have. Lemme see. A quarter of b[2] till tomorrow when I pick up. Though I have

15  clear and fettuccini[3]. And a couple gs of really good snow[4]. I can get more at noon tomorrow

16  (11:05 p.m.)

17  -5178: That work for you? (11:06 p.m.)

18  Z.A.: 3.5 of B? (11:06 p.m.)

19  -5178: I got that s. Sure* (11:06 p.m.)

20  Z.A.: Yeah save me that please lol (11:06 p.m.)

21  Z.A.: That's what you mean by a quarter right (11:07 p.m.)

22  -5178: 6.3 (11:07 p.m.)

23

24  [1] "Text Free" is an application that permits a user to send unlimited and free texts and

25  make WiFi calls from a free phone number.

26  [2] Based on my training and experience, a "quarter of b" is code for a quarter ounce of
black tar heroin.

27  [3] Based on my training and experience, "clear" is a code word for methamphetamine,
while "fettuccini" is a code word for fentanyl.

28  [4] Based on my training and experience, "snow" is a code word for cocaine.

1   Z.A.: Oh. I'll take all of that. 6.3 B (11:07 p.m.)

2   -5178: Quarter piece lol (11:07 p.m.)

3   Z.A.: No clear or Fetty for me man lol (11:07 p.m.)

4   -5178: 6970 [street name removed] road. San diego (11:10 p.m.)

5   Z.A.: 1:08 arrival (11:11 p.m.)

6

7   June 13, 2023, Chat Between Z.A. and -5178

8   Z.A.: 10 minutes out where am I gonna meet you at (1:10 a.m.)

9   -5178: Yes. Lol you remember where the courts are? (1:14 a.m.)

10  Z.A.: Can you give me some pokers[5] again lol. Yea (1:14 a.m.)

11  -5178: Ya (1:14 a.m.)

12

13  June 13, 2023, Chat Between Z.A. and -5439

14  -5439: Yo (1:19 a.m.)

15  Z.A.: Yo lol. I'm pullin up (1:19 a.m.)

16  -5439: Kk forgot the sharps one sec (1:20 a.m.)

17  Z.A.: Kk (1:20 a.m.)

18  Z.A.: Are you at the courts or you coming in my car (1:23 a.m.)

19  -5439: I mean I could go in the car or you can come to the courts whichever's clever (1:23

20  a.m.)

21  Z.A.: I think I have a broken foot lol. So if you can come to my car that would be cool (1:24

22  a.m.)

23  ***Surveillance and Arrest of Ryan Joseph PAYNE***

24       14.    After reviewing the above text messages, on August 3, 2023, investigators

25  initiated an undercover operation in which an undercover agent (UC) utilized Z.A.'s Apple

26  iPhone to communicate with the user of telephone number -5439. The UC ordered one-

27

28  [5] Based on my training and experience, "pokers" and "sharps" are code words for
    syringes with needles.

1 | quarter ounce of heroin by text message from the user of telephone number -5439. The user
2 | of telephone number -5439 ultimately responded on the same day by text message that he
3 | had the heroin and agreed to meet the UC in the parking lot of the Walmart located at 3382
4 | Murphy Canyon Road, San Diego, California within the Southern District of California.
5 | The following are excerpts from that text conversation:

6 |

7 | <u>August 3, 2023, Chat between UC and -5439</u>

8 | UC: Yo yo bro (11:58 a.m.)

9 | -5439: my phone has received your message. I'll message ya back once I see it (11:58 a.m.)

10 | -5439: Bro yoyo (12:13 p.m.)

11 | UC: Hey you loaded up (12:14 p.m.)

12 | UC: B (12:25 p.m.)

13 | -5439: I can be (12:35 p.m.)

14 | -5439: recently kicked out of my pad so like I've been staying in hotels so my money's been
15 | kind of tight right now but I can always get it if you need it (12:36 p.m.)

16 | UC: Sorry bout that. Yeah if you can help out that be great (12:38 p.m.)

17 | UC: I can kick you a few extra if that helps (12:45 p.m.)

18 | UC: Can you make it happen (1:18 p.m.)

19 | -5439: Jes. When do you need it. I moved to El cajon by the way near the GI Joe store. And
20 | how much do you need (1:20 p.m.)

21 | UC: A quarter (1:25 p.m.)

22 | -5439: My guy just got back to me and said he'll be around at 3. So it should work out so
23 | long he's on time. And I do (2:09 p.m.)

24 | -5439: Hey do you have any money on cash rapper or something like that so to put towards
25 | it I'd really appreciate it cuz my guy's down to front me it's just I'd rather get it all done at
26 | once and where you at If I were to deliver it (7:26 p.m.)

27 | UC: Sorry bro I don't but I will cover you for the extra drive (7:28 p.m.)

28 | -5439: Where are you (7:32 p.m.)

UC: Would you want to scoop me and I can give you the money and you can drop me some where (7:32 p.m.)

UC: I'm at the Walmart by the auto area – (Pin Sent with location) (7:33 p.m.)

UC: 3382 Murphy Canyon Road, San Diego, CA 92123 (7:44 p.m.)

-5439: Okay I got it I'm going to pick up my girl real quick and then I'll be heading towards you okay ((8:22 p.m.)

UC: Sounds good. When you think you be here (8:24 p.m.)

-5439: I already am where are you (8:49 p.m.)

UC: I'm in store. Go to my vehicle by auto area. I have a silver Range Rover now. I'll be right out (8:50 p.m.)

UC: Where u at. I'll drive over to you (8:55 p.m.)

UC: In line. Be right out (8:57 p.m.)

UC: Go to my Land Rover. By automotive (8:58 a.m.)

-5439: Meet me in front of Stanton Optical (8:59 p.m.)

15.     Shortly before 9:00 p.m., investigators noticed a black Hyundai Sonata sedan circling the lot with a male driver and female passenger who appeared to be looking into parked cars as they drove around. At approximately 9:00 p.m., the Hyundai Sonata parked with lights on in front of the Stanton Optical store located in the same parking lot and the user of telephone number -5439 texted the UC that he would meet the UC in front of Stanton Optical.

16.     Law enforcement saw Ryan Joseph PAYNE exit the Hyundai Sonata and walk toward the Stanton Optical store. Law enforcement contacted PAYNE and detained him. PAYNE had a black One Plus cell phone in his hands (hereinafter referred to as "PAYNE's One Plus Phone.") Investigators immediately placed a call to the -5439 telephone number, and PAYNE's One Plus Phone rang in response. Investigators placed PAYNE under arrest.

17.     During a search incident to arrest, law enforcement found a plastic "Ziploc" style baggie containing a brown tar-like substance (subsequently analyzed by the DEA SWRL and found to be approximately 6.44 grams of heroin) in PAYNE's pants pocket.

Law enforcement also located the keys to the Hyundai Sonata and a hotel room key in PAYNE's possession.

18.     Law enforcement contacted the female in the passenger seat of the Hyundai Sonata, subsequently identified as C.Y. Law enforcement saw multiple syringes in plain view on the back seat of the car. C.Y. was arrested.

19.     During a probable cause search of the Hyundai Sonata, law enforcement found and seized additional heroin, for a total of approximately 25.41 grams of heroin (including what was found on PAYNE's person), approximately 3.9 grams of methamphetamine, and approximately 5.49 grams of fentanyl. Investigators also found and seized a digital scale with white powdery residue and brown residue from the center console of the car, as well as a money counting machine.

20.     In a post-*Miranda* interview, PAYNE admitted that he came to the Walmart to meet with Z.A. PAYNE admitted that he had known Z.A. as a narcotics customer for approximately six months. PAYNE stated the drugs found by law enforcement belonged to him and that C.Y. was not involved in distributing narcotics. PAYNE gave law enforcement verbal and written consent to search his hotel room in a hotel located in El Cajon, California.

21.     During the consent search of PAYNE's hotel room, which was registered in PAYNE's name, law enforcement found and seized approximately 12.29 grams of fentanyl in four separate baggies, approximately 8.06 grams of methamphetamine, approximately 1.21 grams of heroin, and approximately 0.914 grams of 3,4-Methylenedioxymethamphetamine (MDMA), as well as numerous unused "Ziploc" style baggies. Additionally, investigators found a black Omen 015 laptop computer with serial number 5CDO38LXOZ (hereinafter referred to as **Target Device 1**).

22.     Law enforcement also conducted a post-*Miranda* interview of C.Y. who told them that she and PAYNE are in a dating relationship and she does not distribute controlled substances. C.Y. said that PAYNE supplies her with fentanyl and has for the past two months. C.Y. gave consent for law enforcement to search her cell phone, a Red Apple iPhone with a black case and associated telephone number of (XXX) XXX-0240

(hereinafter referred to as **Target Device 3**) which was found inside of the Hyundai Sonata. Law enforcement found text messages on **Target Device 3** between C.Y. and PAYNE dating back to June 21, 2022 showing drug transactions between PAYNE and C.Y. For example, on June 21, 2022, C.Y. ordered "some" from PAYNE. PAYNE replied that he was waiting to pick up and would let C.Y. know as soon as he gets it. C.Y. was subsequently released from custody and **Target Device 3** was returned to her on August 4, 2023.

23.     As a result of the foregoing, PAYNE was booked into the custody of the San Diego Sheriff's Department at the San Diego Central Jail for violations of California Health and Safety Code (HS) 11352(a) – Transportation/Distribution of Fentanyl, HS 11352(a) – Transportation/Distribution of Heroin, HS 11379(a) – Transportation/Distribution of Methamphetamine, HS 11351 - Possess Fentanyl for Sale; HS 11351 – Possess Heroin for Sale; and HS 11378 – Possess Methamphetamine for Sale.

### *Search of PAYNE's One Plus Phone*

24.     On August 9, 2023, TFO Amman obtained a judicially authorized California state search warrant authorizing the search of PAYNE's One Plus Phone. During a manual review of PAYNE's One Plus Phone, investigators found a "Text Free" application utilizing the -5439 telephone number, and a "TextNow"[6] application utilizing the -5178 telephone number. Both applications contained numerous text conversations with various individuals related to the sale of narcotics by PAYNE. The "Text Free" application contained such conversations dating back to April 2022 and the "TextNow" application contained such conversations dating back to August 2018.

25.     Investigators also found text conversations on both the "Text Free" and "TextNow" apps with Z.A. regarding the sale of narcotics. These conversations dated back to January 26, 2023, but based on the content, it appears that Z.A. and PAYNE were in contact prior to that date.

---

[6] "TextNow" is an application that permits a user to send unlimited free calls and texts over WiFi.

1

### PAYNE's Use of Target Device 3

2      26.     Beginning on or about August 20, 2023, TFO Amman began to receive text
3  messages and telephone calls from the telephone number previously associated to **Target**
4  **Device 3** (C.Y.'s phone). TFO Amman recognized the voice of the caller as PAYNE and
5  the person calling and sending the text messages stated he was PAYNE. PAYNE was
6  inquiring about having his phone (PAYNE's One Plus Phone) and computer (**Target**
7  **Device 1**) returned to him. PAYNE told TFO Amman that he had the use of **Target Device**
8  **3** and that TFO Amman could contact him at (XXX) XXX-0240, the telephone number
9  previously associated to **Target Device 3**.

10

### Federal Arrest of PAYNE on August 28, 2023

11      27.     On August 21, 2023, TFO Amman obtained a federal complaint and arrest
12  warrant for PAYNE in U.S. District Court, Southern District of California, signed by the
13  Honorable Allison H. Goddard, U.S. Magistrate Judge, in magistrate case number
14  23MJ3029. PAYNE was charged with violation of Title 21, United States Code (U.S.C.),
15  Section (Sec.) 841(a)(1) - Possession with Intent to Distribute Heroin (Count 1), 21
16  U.S.C. 841(a)(1) - Possession with Intent to Distribute Fentanyl (Count 2), and 21
17  U.S.C. 841(a)(1) - Possession with Intent to Distribute Methamphetamine (Count 3), based
18  on the foregoing investigation. At that time, PAYNE was out on "Supervised Own
19  Recognizance" under house arrest with GPS monitoring as ordered in San Diego Superior
20  Court Case number CD300076 (resulting from PAYNE's August 3, 2023 arrest). PAYNE
21  was also subject to a court ordered Fourth Amendment waiver as a condition of his release.

22      28.     On August 28, 2023, agents arrested PAYNE at a residence in Carlsbad,
23  California pursuant to the aforementioned federal arrest warrant. C.Y. was also present at
24  the residence. During the subsequent Fourth Amendment waiver search of the bedroom
25  occupied by PAYNE and C.Y., agents found a clear plastic "Ziploc" style baggie with
26  approximately one near net gram of a white powdery substance that tested presumptively
27  positive for fentanyl. A message written on the baggie in red marker said "2 c [heart]."
28  Agents believe the message means that the baggie of suspected fentanyl was given to C.Y.

by PAYNE as a gift to his girlfriend. Agents also found paraphernalia for consuming fentanyl, as well as two cellular telephones in the bedroom occupied by PAYNE and C.Y. A black Apple iPhone (hereinafter referred to as **Target Device 2**) was found on the floor near the bed and **Target Device 3** was found on top of the bed.

29.     Based on my training and experience, the quantities of heroin, fentanyl, and methamphetamine seized on August 3, 2023, PAYNE's "Text Free" and "TextNow" messages found on PAYNE's One Plus Phone, the paraphernalia and indicia of sales in PAYNE's vehicle as well as in his hotel room, among other things, lead me to believe that PAYNE possessed these drugs with the intent to distribute. In light of the above facts and my experience and training, I believe there is probable cause to believe that PAYNE utilized **Target Device 1** prior to his arrest on August 3, 2023, and then continued to engage in illicit criminal activity, to include using **Target Devices 2 and 3**, to communicate with others to further the distribution of illicit narcotics in the United States. Accordingly, I request permission to search **Target Devices 1 – 3** for data beginning on June 21, 2022 up to and including August 28, 2023.

## METHODOLOGY

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION – COMPUTERS AND OTHER ELECTRONIC STORAGE MEDIA

30.     With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

### Forensic Imaging

31.     After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite.  A forensic image is an exact physical copy of the hard drive or other media.  A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data.

Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team.  The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety.  The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance.  It can take several hours to image a single hard drive - the bigger the drive, the longer it takes.  As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

32.     If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices returned within forty-five (45) days of seizure absent further application to this court.

**Identification and Extraction of Relevant Data**

33.     After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system.   Computers are easily customized by their users.   Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to

1  view and analyze imaged data.

2      34.    Analyzing the contents of a computer or other electronic storage device, even
3  without significant technical challenges, can be very challenging.  Searching by keywords,
4  for example, often yields many thousands of hits, each of which must be reviewed in its
5  context by the examiner to determine whether the data is within the scope of the warrant.
6  Merely finding a relevant hit does not end the review process for several reasons.  The
7  computer may have stored metadata and other information about a relevant electronic record
8  – e.g., who created it, when and how it was created or downloaded or copied, when it was
9  last accessed, when it was last modified, when it was last printed, and when it was deleted.
10  Keyword searches may also fail to discover relevant electronic records, depending on how
11  the records were created, stored, or used.  For example, keywords search text, but many
12  common electronic mail, database, and spreadsheet applications do not store data as
13  searchable text.  Instead, the data is saved in a proprietary non-text format.  Documents
14  printed by the computer, even if the document was never saved to the hard drive, are
15  recoverable by forensic programs because the printed document is stored as a graphic
16  image.  Graphic images, unlike text, are not subject to keyword searches.  Similarly, faxes
17  sent to the computer are stored as graphic images and not as text.  In addition, a particular
18  relevant piece of data does not exist in a vacuum.  To determine who created, modified,
19  copied, downloaded, transferred, communicated about, deleted, or printed the data requires
20  a search of other events that occurred on the computer in the time periods surrounding
21  activity regarding the relevant data.  Information about which user had logged in, whether
22  users share passwords, whether the computer was connected to other computers or
23  networks, and whether the user accessed or used other programs or services in the time
24  period surrounding events with the relevant data can help determine who was sitting at the
25  keyboard.

26      35.    It is often difficult or impossible to determine the identity of the person using
27  the computer when incriminating data has been created, modified, accessed, deleted,
28  printed, copied, uploaded, or downloaded solely by reviewing the incriminating data.

Computers generate substantial information about data and about users that generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.  The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

36.     Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.   And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

37.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data

from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed.

38.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION - CELLPHONES

39.     It is not possible to determine, merely by knowing the cellular telephone 's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

40.     Following the issuance of this warrant, I will collect the subject cellular telephones and subject it to analysis.  All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

41.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.  The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

42.     The United States has not attempted to obtain this data by other means.

### CONCLUSION

43.     Based my training and experience, consultation with other agents experienced in narcotics investigations, and the facts set forth herein, there is reason to believe that **Target Devices 1 – 3** contain evidence of drug sales, as well as evidence of the use of electronic communications facility to further the foregoing offenses. I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of PAYNE's distribution of heroin, fentanyl, and methamphetamine, in addition to other federally controlled substances.

44.     Based on the forgoing, I respectfully request that the Court issue the proposed warrants authorizing me, a Task Force Officer Officer with DEA, or another law enforcement employee specially trained in digital evidence recovery, to search the items described in A-1, A-2, and A-3 and seize the items listed in Attachment B using the above-described methodology.

45.     I swear the foregoing is true and correct to the best of my knowledge and belief.

//

//

//

Task Force Officer Lisa Amman
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 by telephone on this 13 day of October, 2023.

Honorable Michelle M. Pettit
United States Magistrate Judge